# McAFEE v. GRAY.

---

PATENTS; INTERFERENCE; BURDEN OF PROOF; WITNESSES; DISCLOSURE.

1. In an interference involving the question of originality of invention, the burden is upon the junior party of clearly showing that he, acting independently, is the inventor.

2. Memoranda used by one of the parties to an interference while testifying as a witness in his own behalf, for the purpose of refreshing his memory, do not have the effect of corroborating his testimony within the meaning of the rule that the uncorroborated testimony of a party to an interference is insufficient to establish priority of invention.

3. Where it is contended that a witness was lacking in the technical knowledge which his answers to questions on direct examination implied, failure on the part of the party making such contention to cross-examine the witness and so disclose the witness's lack of such knowledge, is a significant circumstance.

4. In an interference involving the refinement of lubricating oil by improving its color by heating it in the presence of aluminum chlorid, disclosure by one of the parties of a process of treating gas

oil in the same manner that lubricating oils had been treated and then distilling it with aluminum chlorid, holding the temperature of the still as low as possible "to make the maximum yield of gasolene," is not a disclosure of the invention of the issue.

5. While the absence of material contradiction of the testimony of one of the parties to an interference and that of a corroborating witness will not of itself require that the court shall hold such testimony to be conclusive, it must have that effect unless the record discloses some good reason for not doing so.

6. In an interference in which it appears that a third party was the inventor, and that the junior party communicated the invention of such third party to the senior party, who claimed, but did not prove, that such third party was working under his instructions, and, therefore, what he discovered was his, priority must be awarded the junior party, the third party not being before the court.

No. 1121.   Patent Appeals.   Submitted November 15, 1917.   Decided January 7, 1918.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference case.                    *Reversed.*

The facts are stated in the opinion.

*Mr. Alfred M. Houghton, Mr. K. P. McElroy,* and *Mr. Clair W. Fairbank* for the appellant.

*Mr. J. Edgar Bull* and *Mr. C. G. Heylmun* for the appellee.

Mr. Chief Justice SMYTH delivered the opinion of the Court:

This is an appeal from an award of priority to Gray of an invention for the refining of high-boiling constituents of petroleum oils, particularly lubricating oils. The issues are defined in seven counts, of which counts 1, 4, and 6 are typical. They read:

"1. The method of purifying high boiling constituents of petroleum which consists in heating the same in the presence of aluminum chlorid to a temperature of from 150° F. to about 212° F. for a period of from two to six hours."

"4. In the purification of high boiling mineral lubricating oils, the process which comprises heating such oil with dry aluminum chlorid to a temperature around 150° F., allowing the oil to cool and separating the oil from the chlorid sludge."

"6. The process of bleaching, stabilizing, and purifying lubricating oils which comprises producing an internal condensation attended with deposition of carbon and saturation of unsaturated groups by warming such oil with a catalytic chemical and thereafter treating the oil with sulphuric acid." Stated in general terms, the invention embraces a process by which lubricating oil is purified and the color improved thereby.

Almer McDuffie McAfee and George William Gray, at the time of the invention, were highly educated chemists, both having received the degree of Ph.D.,—one in 1910 and the other in 1895. They were employed by the Texas company, a concern engaged in the refining of petroleum, with headquarters at Houston, Texas. It had a laboratory at Bayonne, New Jersey, and another at Port Arthur, Texas. McAfee was engaged at Bayonne during the summer of 1912, and while there made, as he claims, a special study of petroleum, particularly the lubricating fractions. Later he was transferred to Port Arthur, where, according to his testimony, he made the invention in controversy. Gray asserts that McAfee was his assistant at Port Arthur, and that he gave him, as such, a disclosure of the general plan of the invention, together with instructions from time to time sufficient to enable McAfee to work out the details revealed by the counts. McAfee, on the other hand, denies this and asserts that, so far at least as the invention is concerned, he was not Gray's subordinate. He also urges that he disclosed the invention to Gray long before any of the dates on which the latter claims to have conceived it. The Examiner of Interferences decided in favor of Gray, and was overruled by the Examiners in Chief, who, in turn, were reversed by an Assistant Commissioner.

Gray, while asserting that he conceived the invention, does not claim to have himself reduced it to practice, but contends that what McAfee did in that regard inures to Gray's benefit, because McAfee, as he asserts, was his assistant, acting in pur-

suance of his instructions. It will be seen, therefore, that the question is which one originated the invention.

McAfee, being the junior party, has the burden of clearly showing that he, acting independently, is the inventor. He testified that on December 4, 1912, he conceived the invention when he observed the saturating action of aluminum chlorid on petroleum oil; that his conception was largely the result of work which he had done during the preceding summer; that the Texas company, for which he was working, was particularly interested in the manufacture of lubricating oils with as little color as possible; that connecting his work of the previous summer with the aluminum chlorid reaction which he had noticed on December 4, he conceived the idea "that it might be possible to lower the iodine values of lubricating oils, and therefore improve their color, by warming with aluminum chlorid." For the purpose of refreshing his memory with regard to this he produced a memorandum made by him at the time of the experiments related. Later on, January 15, 1913, he treated "a comparatively large quantity of lubricating oil with a certain amount of aluminum chlorid to a certain temperature for a definite time, all of these conditions," he said, "having been previously established as being the proper conditions from my preliminary work on hand samples." Upon this point he refreshed his memory also from a note book made at the time of the treatment. He further said that he received absolutely no instructions from Mr. Gray or any other person relating to the treatment of lubricating oil in any manner until after February 4, 1913, the date on which Gray conceived the invention, if his claim be correct. This testimony, as we understand the record, is in no material respect contradicted. Is there any corroboration of it? The memorandums used by McAfee, while strengthening his testimony, do not have the effect of corroborating it within the meaning of the law. It was the same witness who spoke through the memorandums and. in the person of McAfee.

This brings us to consider the testimony of George H. King, a stillman under McAfee, who is put forward as a corroborating witness. He stated that on February 5, 1913, he assisted

McAfee in performing the process for purifying lubricating oils by warming the oil with aluminum chlorid from 150° F. to 212° F. from two to six hours, and further said that he first acted as stillman for McAfee on January 22, 1913. On that date he needed, according to his testimony, some lubricating oil to oil machinery, and began looking around for it. He asked Mr. McAfee for a sample of oil, and was told by him "to filter the sample from a 5 gallon which was sitting inside of his building." "I filtered," he said, "as much as a 4-ounce sample and used it for lubricating purposes." The oil before filtering was a brick red, afterwards a very light color. Asked if he understood the process on that date, January 22, he said he did not, but that he understood it thoroughly on February 5, the date on which he first assisted McAfee in performing it. In criticism of King's testimony, it is claimed by Gray that the filtering of these oils was a difficult problem, worked out only after careful experimentation, and that "it is unreasonable to presume that this filtration could have been made by the stillman King, who had no chemical knowledge or skill in manipulation, and, at that, through the medium of filtering paper." But in one of the letters which passed from McAfee to Gray it is stated that "a 4-ounce sample, however, which has been kept stoppered since treating, shows 15 color on filtering through filter paper," and Mr. Gray in his amended specifications tells us that "a sample is then drawn from the still and after being filtered through paper is examined as to its color." He is not, therefore, in a position to claim that the filtration could not be accomplished "through the medium of paper." And as this operation of filtration does not require chemical knowledge, certainly there is nothing in the record which shows that it does, we think that King's testimony is not discredited on the theory advanced by Gray. King, when interrogated as to how he came to remember that it was on February 5 he assisted McAfee in performing the process referred to above, said that he did so "because we * * * heated" the oil "about three hours, shut fire off, and allowed mixture to run overnight, something which we had not done before and have not done since." He also said that he had performed many times the process of

warming lubricating oil with dry aluminum chlorid from about 150° F. to about 212° F.; that he was able to recognize the oil made by this process before it was filtered; that the unfiltered oil which Mr. McAfee gave him on January 22, 1913, was exactly the same as the oil made by that process; that since February 5 he many times filtered oil which he knew to be made by the process just defined; that he always found it to have a light color; and, finally, that there was no difference between the color of the oil filtered by him under the direction of Mr. McAfee on January 22, 1913, and the oil which he knew to be made by the process just referred to, being the process defined in the counts. He fixes January 22 as the date upon which he received the oil from McAfee, because, as he asserts, on the second night after he commenced his work with the latter, the still blew up, and McAfee's notebook shows that this happened on January 23. King was not cross-examined. This is a significant circumstance and tends to show that Gray did not believe that he could develop that King was lacking in the knowledge which his answers implied, and hence was not telling the truth. If King was, as Gray claims, a mere stillman who "had no chemical knowledge or skill in manipulation," it could have been easily disclosed by an intelligent cross-examination. We believe that King told the truth and therefore fully corroborated the testimony of McAfee as to the work done on January 22 and February 5, 1913.

As to the date on which the invention was reduced to practice, McAfee, in his report to Gray March 4, 1913, shows that he had accomplished the reduction some time before. The exact date is not disclosed, nor is it material in the view which we take of the matter. Gray does not deny that McAfee reduced the invention to practice, nor does he contend that he did any work on the process himself; his theory being that the reduction to practice was accomplished by McAfee acting in pursuance of his directions, and therefore, on the doctrine of principal and assistant, he is entitled to the benefit of McAfee's work.

With respect to the origin of the invention, Gray testified that he did not conceive it before the 3d of February, 1913. On that date, according to him, Dr. McAfee was in his office

with several samples, one a standard white oil which had been treated with anhydrous aluminum chlorid and which was considerably lighter in color than standard white oil. At this time McAfee also showed him a sample which he declared, according to Gray, was the residue which had been left in the still after the manufacture of gasolene by means of anhydrous aluminum chlorid. This residue was a light green in color. Gray further said that in ordinary operations a residue from distilling paraffin gas oil down and leaving a small percentage in the still would have been very dark in color. This product, however, was very light, being, as we have related, a light green. He talked the matter over with McAfee, and later wrote him to treat a sample of gas oil in the same manner that lubricating oils had been treated, and then distil it with aluminum chlorid, holding the temperature of the still as low as possible "to make the maximum yield of gasolene." The letter containing these instructions was written by Gray on February 4, 1913. This letter, according to Gray, revealed the plan which led to the invention. We do not think so. As we read it, there is nothing in it which discloses any thought on his part of improving the color of lubricating oil. On the other hand, it clearly shows that what he had in mind did not relate to lubricating oils, but to a process by which, as he writes, "to obtain maximum yield of gasolene having a final distillation point of 350." This is the only testimony upon which Gray relies to show conception by him on February 4. It is entirely insufficient. Besides, the record shows that almost two years after the date on which he now claims he conceived the invention, he was not at all clear about it. In his preliminary statement made in June, 1914, he said that he conceived it January, 1913, and he repeated this in November, 1914, when he made his preliminary statement as to the added counts 6 and 7. This uncertainty necessarily lessens the weight which his testimony upon the subject would otherwise have. True, McAfee was not always consistent, but he adhered rigidly to his first statement with respect to the date upon which he claims to have conceived the invention. Gray, in our opinion, has completely failed to show conception by him on the date claimed, February

4, 1913. But even if it were otherwise, it would be imma-
terial if McAfee had conceived the invention in December or
January before. McAfee's testimony on this point, which is
fully corroborated by King, clearly establishes that on Decem-
ber 4, 1912, or at latest in January, 1913, it matters not which
since in either event it would be ahead of the date of conception
claimed by Gray, he conceived the thought that the color of
lubricating oil might be improved by heating it in the presence
of aluminum chlorid. This is the idea for which he claims a
patent. There is no material contradiction either of his testi-
mony or of King's. And while this in itself would not warrant
us in holding the testimony conclusive, we must do so unless
the record discloses some good reason why we should not
(*United States* v. *Lee Huen*, 118 Fed. 457; *Quock Ting* v.
*United States*, 140 U. S. 420, 35 L. ed. 502, 11 Sup. Ct. Rep.
733, 851; *Kavanagh* v. *Wilson*, 70 N. Y. 177; *Wait* v. *M'Neil*,
7 Mass. 261; *Murphey* v. *Virgin*, 47 Neb. 692, 66 N. W. 652),
and we perceive none. We are also of the opinion that when
McAfee reduced the invention to practice he was acting inde-
pendently of Gray, and therefore he, and not Gray, is entitled
to the benefit of what he accomplished. It follows that McAfee
should be given priority as to counts 1, 2, 3, 4, and 5.

This leaves counts 6 and 7 to be considered. They call for
the treatment of oil produced by the process of the other
counts, before filtration with sulphuric acid. McAfee in his
report to Gray, June 13, 1913, said: "Dr. Dengler has ap-
parently solved the difficulty completely and satisfactorily. He
treats the oil containing the suspended solid with fuming sul-
phuric acid   *   *   *   and the color is further apparently
improved." This is an admission on the part of McAfee that
Dengler was the inventor of the process covered by counts 6
and 7. Gray does not claim to have made the invention him-
self, but asserts that he put Dr. Dengler to work with instruc-
tions and, therefore, that whatever Dengler discovered in pur-
suance of those instructions belongs to him. There is nothing
in the instructions which he gave to Dengler that would indicate
the steps pursued by the latter as described in McAfee's report.
Gray's testimony on this point is: "I had given instructions

for another man to be placed on this work to hasten it. This party was Dr. Dengler." But he nowhere says that he gave Dengler any plan by which the latter could solve the difficulty which confronted him. Hence we do not think Gray is entitled to what Dengler discovered. Dr. Dengler when he made his invention reported it to McAfee, and McAfee, as we have seen, revealed it to Gray on June 13. McAfee, therefore, was in possession of the invention before Gray, and, as between him and Gray, Dengler not being before us so that his rights can be passed upon, McAfee is entitled to priority.

The decision of the Assistant Commissioner is reversed and priority of invention as to all the counts is awarded to Almer M. McAfee.                                    *Reversed.*