**SHELL DEVELOPMENT CO. v. PURE OIL CO. et al.**

**SOCONY–VACUUM OIL CO. v. PURE OIL CO. et al.**

Civ. Nos. 2434–51 and 2776–51.

United States District Court for the District of Columbia.

March 4, 1953.

Herbert L. Shepard, Emeryville, Cal., Edward B. Beale, Washington, D. C., for Shell.

Richard K. Stevens, Washington, D. C. (Robert E. Watkins and Myron J. Burkhard, New York City, of counsel), for Socony-Vacuum.

Edward H. Lang, Chicago, Ill., Bernard F. Garvey, Washington, D. C., for Pure Oil.

KEECH, District Judge.

There are before the court two actions under R.S. § 4915 [1952 Revision, 35 U.S. C.A. §§ 145, 146], Shell Development Co. v. Pure Oil Co., Civil Action No. 2434–51, wherein Shell seeks issuance of a patent, and Socony-Vacuum Oil Co., Incorporated v. Pure Oil Co., Civil Action No. 2776–51, wherein Socony seeks issuance of a patent. These actions grew out of applications filed by Zublin, assignor of Shell, Cauley, Assignor of Socony, and Bond, assignor of Pure Oil, for a patent on the same subject matter. An interference proceeding followed in the Patent Office, resulting in the award of a patent to Pure Oil. The two court actions were consolidated for hearing by a consent order. Hearing of these causes extended over a period of five days, and the matter was argued at length by counsel for the respective parties, all of whom have filed briefs.

These actions, by statute and judicial pronouncement, are not in the nature of an appeal, but are de novo proceedings.[1] As permitted by the statute[2] there are before the court for its consideration not only large portions of the record before the Patent Office, but also substantial additional testimony offered for the first time before this court. Socony shifted the emphasis in its case from an alleged actual reduction to practice, relied on and rejected by the Patent Office, to prior conception, which had been alleged but not urged in the Patent Office proceedings. At the outset, Pure Oil objected to admission of any evidence which was or could have been available at the time of the Patent Office proceedings, but was not introduced there.

New evidence may be received which strengthens contentions already fully made and supported by testimony before the Patent Office,[3] where there has been no suppression, bad faith, or gross negligence on the part of the party offering it.[4] The court found that the circumstances in this case did not indicate any bad faith, suppression, or gross negligence on the part of Shell or Socony, and that the proffered evidence tended to strengthen contentions already made in the Patent Office. Hence, there was no estoppel, and the new evidence was admitted.[5]

1. International Standard Electric Corp. v. Kingsland, 83 U.S.App.D.C. 355, 169 F. 2d 890.

2. R.S. § 4915, 35 U.S.C.A. § 63; Hoover Co. v. Coe, 325 U.S. 79, 69 S.Ct. 955, 89 L.Ed. 1488; Standard Oil Development Co. v. Marzall, 86 U.S.App.D.C. 210, 181 F.2d 280.

3. Nichols v. Minnesota Mining & Mfg. Co., 4 Cir., 109 F.2d 162.

4. Knutson v. Gallsworthy, 82 U.S.App.D. C. 304, 164 F.2d 497.

5. Globe-Union, Inc., v. Chicago Telephone Supply Co., 103 F.2d 722; Wright v. Runge, D.C.D.C., 31 F.Supp. 844.

Counsel for the respective parties have been of real assistance to the court in the presentation of their contentions and authorities in support thereof. Indeed, counsel have substantially agreed upon the basic legal principles applicable.

The claimed invention or "count", as it is known in an interference proceeding, reads:

"In the treatment of hydrocarbon oils containing heavy mercaptides for the removal thereof which comprises contacting oil containing heavy mercaptides with aqueous alkali metal hydroxide reagent containing an effective amount of soluble organic oxidation promoter itself capable of oxidation and an amount of mercaptides sufficient to protect said promoter to extract said mercaptans and to produce a fat reagent containing heavy mercaptides, separating said fat reagent, regenerating said fat reagent by passing oxygen-containing oxidizing gas therethrough to oxidize a portion of said mercaptides to disulfides and to retain sufficient of said mercaptides to protect said promoter, separating said disulfides to produce a lean reagent, and contacting hydrocarbon oil containing heavy mercaptides with said lean reagent, the improvement which comprises contacting hydrocarbon oil containing predominantly heavy mercaptans with aqueous alkali metal hydroxide reagent containing an effective amount of soluble organic oxidation promoter itself capable of oxidation and an amount of mercaptides sufficient to protect said promoter to extract heavy mercaptans and to produce a fouled reagent containing heavy mercaptides, introducing light mercaptans into said fouled reagent in an amount sufficient to ensure substantially complete oxidation of said heavy mercaptides to disulfides whilst oxidizing a portion of said light mercaptides during regeneration and to retain sufficient mercaptides comprising substantially only light mercaptides to protect said soluble organic oxidation promoter after regeneration, regenerating said fouled reagent by passing oxygen-containing oxidizing gas therethrough to oxidize substantially all of said heavy mercaptides and a portion of said light mercaptides to disulfides whilst retaining an amount of mercaptides comprising substantially only light mercaptides sufficient to protect said promoter, and separating said disulfides to obtain a lean reagent containing a protective amount of mercaptan sulfur comprising substantially only light mercaptides."

In lay language, the invention in substance is an improvement in the art of treating hydrocarbon oils with an aqueous alkali metal hydroxide reagent for the purpose of removing mercaptans [6] from the oil. The fouled or "fat" reagent, which contains an organic oxidation promoter or catalyst, is regenerated for recycle by passing an oxidizing gas through it, which oxidizes the mercaptides to disulfides which may be separated from the reagent. A certain amount of mercaptans must be retained in the reagent during regeneration in order to prevent loss of the organic oxidation promoter, which is itself capable of oxidation. Mercaptans are classified as "heavy" and "light" mercaptans, according to molecular weight. It is known that the light mercaptans have a higher partition or distribution coefficient than the heavy mercaptans, that is, they are more easily extracted from the gasoline by the treating solution; that the light mercaptans have a correspondingly lower re-entry value than the heavy mercaptans, that is, they re-enter

6. "mercaptan....*Chem.* Any of a series of compounds of the general formula RSH, analogous to the alcohols and phenols, but containing sulphur in place of oxygen * * *." (Webster's New International Dictionary, 2d ed., 1952.) Mercaptans are present to varying extents in crude oils, have a disagreeable odor, and are removed in order to make the refined product more salable. The Board of Interference Examiners of the Patent Office in its decision and the parties have recognized that the terms "mercaptans" and "mercaptides" are used interchangeably in the interference count.

the gasoline from the regenerated treating solution less readily than the heavy mercaptans; and that the heavy mercaptans in general oxidize more readily than the light mercaptans. There is an accord among the parties that the new feature of the interference count, in lay language, is the adding of light mercaptans to a fouled treating solution containing predominantly heavy mercaptans so that substantially all of the heavy mercaptides may be oxidized and removed therefrom during regeneration, while enough light mercaptides remain unoxidized to protect the promoter from oxidation. Such an improvement is important from an economic standpoint, since it permits removal of substantially all the heavy mercaptides and protects the oxidation promoter from loss by oxidation through the retention of only light mercaptans, which will re-enter the gasoline less readily from the regenerated treating solution.

The parties are agreed that priority of invention should be awarded to the party who was either the first both to conceive and to reduce the invention to practice or, in lieu thereof, was the first to conceive the invention and was proceeding with reasonable diligence to a reduction to practice from a time just prior to the time his opponent entered the field up to the completion of his own reduction, actual or constructive.[7]

The respective conception dates now claimed by the parties are: Cauley, March 15, 1943; Zublin, October 25, 1943; and Bond, January 26, 1944. The respective dates of constructive reduction to practice, through filing of the patent applications, are: Bond, March 4, 1944; Cauley, April 6, 1944; and Zublin, April 15, 1944. None of the parties rely in this action on an actual reduction to practice.

The Board of Interference Examiners in its final decision found that Cauley had failed to establish March 15, 1943, as his conception date and restricted him to April 6, 1944, for conception and reduction to

practice; that Zublin had proved October 25, 1943, and Bond had proved January 26, 1944, as their conception dates; but held that Bond was entitled to the patent because he first reduced to constructive practice and Zublin was found to be lacking in diligence from December 3, 1943, to February 7, 1944.

The plaintiff in any interference proceeding under § 4915 has the heavy burden of overcoming the decision of the Patent Office "by testimony which in character and amount carries thorough conviction."[8] On the record in this case, the court is convinced that the right of Pure Oil to the patent issued has been overcome by evidence which in character and amount carries thorough conviction, and that, if the count be patentable, Socony is entitled to the patent.

Cauley bases his alleged conception date on a memorandum of March 15, 1943, to Mr. L. T. Doiron, chief chemist at Socony's East St. Louis refinery, and an accompanying drawing, entitled "Proposal C," of a suggested modification of the East St. Louis plant.[9] The memorandum does not expressly state that it is proposed that light mercaptans be added to a fouled treating solution containing heavy mercaptans before regeneration by oxidation, so that substantially all of the heavy mercaptans may be extracted while enough light mercaptans remain unoxidized to protect the catalyst from oxidation; but the diagram of "Proposal C" shows fouled treating solution from a vapor phase cracked gasoline, which would contain a predominant amount of light mercaptans, combined with the fouled treating solution from straight run gasoline, which would contain a predominant amount of heavy mercaptans, and regeneration together of the fouled treating solution from the two phases, the regenerated treating solution being thereafter divided and returned to the two phases for treatment of further gasoline. Thus, while no express statement of the invention is made, the diagram pictures

---

7. Abbott v. Shepherd, 77 U.S.App.D.C. 101, 135 F.2d 769; Revise and Caesar, Interference Law and Practice, Vol. 1, Sec. 173, p. 538.

8. Morgan v. Daniels, 153 U.S. 120, 125, 14 S.Ct. 772, 38 L.Ed. 657.

9. Socony Exhibit No. 3.

a practical application of the principle of the invention.

Although the diagram includes a caustic prewash settler, which would remove some of the light mercaptans from the vapor phase cracked gasoline, so that some of the light mercaptans would be removed from the gasoline and discarded with the first stage prewash solution, the purpose of the prewash was to remove hydrogen sulfide and a portion of the light mercaptans would remain in the fouled reagent from the vapor phase gasoline which was combined with the fouled reagent from the straight run gasoline.

The memorandum and diagram were prepared by Cauley at the East St. Louis refinery, where he had been sent at the request of East St. Louis personnel for the purpose of assisting them in certain problems being encountered in their sodium cresylate treating operation and to discuss the application of the caustic tannin process to their operations. At that time the East St. Louis refinery was treating Illinois crude oils which contained varying amounts of heavy mercaptans.

From about June, 1942, to about February, 1943, Cauley, under the direction of Dr. John Happel, had been engaged in experiments on mercaptan extraction which resulted in T.A.C. Report GPG–1, dated September 30, 1943, and released by the Petroleum Industry War Council under date of October 21, 1943, to members of the petroleum industry as a restricted bulletin, entitled "The Tannic Acid Sweetening Process," [10] describing a new process developed by Socony for the treatment of gasolines and combining mercaptan removal with regeneration of treating solutions by air blowing in the presence of an alkali-soluble oxidation catalyst. Doctor Happel testified that Cauley worked on the GPG–1 project under his general supervision, that they collaborated on the general description of the processes and summary in the report, discussed the results of Cauley's work to-

gether, and that it would be difficult to say where one left off and the other began, except that Cauley performed all the experimental work, upon which Happel relied, and that the tables appearing in the report were the work of Cauley alone. Tables in GPG–1 show the minimum mercaptan sulfur concentrations required for protection of the oxidation catalyst and the variance in the regeneration rates of different mercaptans. When Cauley went to the East St. Louis plant in March, 1943, he therefore approached the problem there not only with a wide general knowledge of mercaptan extraction processes and the use of organic oxidation promoters, but with the specific knowledge of the relative rates of oxidation of the different mercaptans later incorporated in GPG–1.

Cauley testified that the purpose of mixing the two spent solutions was to get an improved type of regeneration which would give better extraction efficiency on the raw straight run gasoline, and that he discussed the proposal with the witness Ferguson at the time it was made. Mr. Ferguson, who was manager of the light oil treating department in the East St. Louis refinery, which extracted mercaptans from gasoline, and who was faced with the problem of modifying the existing plant for efficient treatment of varying crude oils with a heavy mercaptan content, testified that Cauley fully disclosed to him the purpose of the proposed modification, including the invention stated in the interference count.

■ "A complete conception, as defined in an issue of priority of invention, is matter of fact, and must be clearly established by proof. The conception of the invention consists in the complete performance of the mental part of the inventive act. All that remains to be accomplished, in order to perfect the act or instrument, belongs to the department of construction, not invention. It is therefore the formation, in the mind of the inventor, of a definite and permanent idea of the complete

10. Shell Exhibit No. 23. The report was submitted to the American Chemical Society for publication on June 10, 1943, and was published in Industrial and Engineering Chemistry, Vol. 39, p. 1655, December, 1947. Patents based on the process described in GPG–1 have been issued to Happel and Cauley as Patents No. 2,453,067, 2,516,837, 2,599,449, and 2,606,099.

and operative invention, as it is thereafter to be applied in practice, that constitutes an available conception within the meaning of the patent law." [11] Inasmuch as there must be some objective evidence of the inventor's conception, "a priority of conception is established when the invention is made sufficiently plain to enable those skilled in the art to understand it." [12]

The testimony of Cauley and Ferguson as to the completion of Cauley's disclosure of his conception in their discussion of "Proposal C" is far more persuasive than the combination of oral and written evidence on which the Board of Interference Examiners made its award of January 26, 1944, as Bond's conception date. Cauley was a man who had done a great deal of prior experimental work on mercaptan removal, was the originator not later than February, 1943, of the data on relative oxidation rates of various mercaptans subsequently incorporated in GPG–1, and went to the East St. Louis refinery to deal with the specific problem of improving mercaptan extraction in crude oils containing predominantly heavy mercaptans. His testimony as to his disclosure is corroborated by the memorandum of March 15, 1943, with its attached diagram, as well as by the testimony of Ferguson. Ferguson's testimony is credible. He was manager of the refinery department which treated gasoline to extract mercaptans; he was the man faced with the problem Cauley was called upon to solve; he saw Cauley make a rough working sketch of "Proposal C"; he saw the memorandum to Doiron and the finished drawing of the proposed modification at or about the time they were prepared; he was familiar with the general methods then in use for removal of mercaptans; it would be natural for Cauley to explain and discuss his suggestions with Ferguson;

and it would be more natural for Ferguson to remember the substance of their discussions than for him to forget it. His testimony as to the purpose of Cauley's trip to East St. Louis is supported by contemporaneous written memoranda. [13]

In a supplemental brief, Shell argues strongly that Socony failed to reduce to practice, although it attempted to do so in November, 1943, at a pilot plant in Vernon, California, and that this shows lack of conception on the part of Cauley at that time. In answer to Shell's argument, it should be noted, first, that none of the parties introduced in the de novo proceeding in this court the evidence before the Patent Office on the issue of actual reduction to practice by Socony, and, second, that there is nothing in the record which shows actual reduction to practice by any of the parties. Thus, all this court has before it is a conclusion in the decision of the Board of Interference Examiners of the Patent Office that Cauley had failed to establish actual reduction to practice, without the evidence on which the conclusion was based. The decision, however, indicates that much of the evidence which was offered by Cauley in support of the alleged actual reduction to practice, the Board held inadequate on the ground of hearsay. Further, a memorandum of November 9, 1943, to D. R. Lamont of Socony from Myron J. Burkhard, Socony's patent attorney in New York, makes a full written disclosure of the invention by Cauley. [14]

▬▬▬ This court is aware of the generally unsatisfactory nature of oral testimony as to prior unpatented disclosures which are set up as anticipation. [15] However, from Cauley's memorandum of March 15, 1943, to Doiron, its accompanying dia-

11. Mergenthaler v. Scudder, 11 App.D.C. 264, 276.

12. Townsend v. Smith, 36 F.2d 292, 295, 17 C.C.P.A.,Patents, 647.

13. Socony Exhibits No. 2 and 4.

14. Socony Exhibit No. 10. While November 9, 1943, would not prevail over Zublin's conception date of October 25, 1943,

it refutes the argument that Cauley had no conception of the invention in November, 1943, and shows clearly that Cauley's conception antedated Bond's and Russell's conception of January 17, 1944, more fully disclosed January 26, 1944.

15. The Barbed Wire Patent (Washburn & Moen Mfg. Co. v. Beat 'Em All Barb-Wire Co.), 143 U.S. 275, 12 S.Ct. 443, 36 L.Ed. 154.

gram of "Proposal C," as supplemented by the oral testimony of the witnesses Cauley and Ferguson, and with the background of Cauley's work on the GPG–1 project, the court finds that Socony has proved March 15, 1943, as Cauley's conception date. This finding does not overrule a Patent Office finding on the same evidence, since the court has before it much additional evidence not introduced before the Board of Interference Examiners. Further, since the Board took the view that Cauley had abandoned the conception date of March 15, 1943, alleged in his preliminary statement, because the matter was not urged in his brief for final hearing, and that he was "apparently" content to rest his case on a claim of actual reduction to practice, the Board's statement as to Cauley's conception date may be considered in the nature of dictum.

The court finds that Shell has proved Zublin's conception date as October 25, 1943.

The court finds that Pure Oil's evidence of disclosure of Bond's invention on January 26, 1944, at a conference with Messrs. Lang, Henderson, and Ross of Pure Oil, is unsatisfactory. The original application of Pure Oil was filed by Bond and one Nelson B. Russell as co-inventors, on the theory that it was based on Disclosure 4–2 of January 17, 1944.[16] Thereafter, as the result of a laboratory conference on May 27 or 28, 1946, at which it was decided to amend the application to make Bond the sole inventor, a disclaimer was obtained from Russell, dated May 27, 1946. Another disclaimer by Russell was obtained January 20, 1953. The evidence as to why Russell was dropped as co-inventor is conflicting and confusing.[17] However, as late

16. Pure Oil Exhibit No. 7.

17. Mr. Lang testified in a deposition taken June 13, 1950 (Record, p. 595):

"The invention disclosure which furnished the basis for this application was Invention Disclosure Number 4–2, which has been offered in evidence as Exhibit Number 1 (Pure Oil Exhibit 7). By referring to that exhibit you will see that it is signed by both Donald C. Bond and Nelson B. Russell.

"We had given specific instructions to the laboratory that invention disclosures were to be executed by the rightful inventors, and that the Patent Department would follow the names on the invention disclosures in filing applications, unless we had reason to believe that the inventors had been improperly stated.

"When we became involved in the present interference, following the preliminary statement I made a survey of the proofs that would be available to us in connection with the interference, and from the proofs available to me, I concluded that the invention of the interference was the sole invention of Dr. Bond, and not a joint invention of Bond and Russell. I took this matter up with Dr. Bond and with Nelson B. Russell, and they acquiesced in the conclusion I had come to, and as a result thereof, Nelson B. Russell filed a disclaimer of inventorship and converted the application from a joint to a sole.

"Q. When, in respect to discovery of this fact was the application so converted? A. It was done within a very short time after we had made the discovery, and after I had discussed the matter with the two originally named inventors.

"Q. And prior to that time, had there been any indication that the application had been—in this particular case—incorrectly filed in the joint names? A. No, we believe that as originally filed, the invention was the invention of the two inventors, and we had no reason at that time to change the inventorship in the case.

"Q. From what data and information did you prepare the subject matter which was incorporated by you into applicant's serial number 525,096? A. The sources of my information were: First, the prior art as I know it. I had done a considerable amount of work in the prior art, and had a fairly good general knowledge of this particular subject matter.

"Secondly, Invention Disclosure 4–2, which has been put in evidence as Exhibit 1 (Pure Oil Exhibit 7).

"Thirdly, the report which I received from Dr. Bond and which has been put in evidence as Exhibit Number 4 (Pure Oil Exhibit 10).

"Next, the subject matter of discussion at our laboratory conference of January 26th, 1944. * * *

"Also, Disclosure Number 4–4, which has also been put in evidence, as I recall."

Pure Oil Exhibit No. 34, "Report on Conference Held at Northfield Chemical Laboratory May 28, 1946," prepared

as December, 1952, Bond testified in a deposition that he and Russell were joint inventors of the subject matter of the disclosure contained in the interference count.[18] This evidence was not before the Patent Office. Further, Pure Oil's attor-

by Mr. Lang shortly after the conference, reads in part:

"I pointed out that if the Bond patent and abandoned Case 373 would not sustain a reduction to practice, we would have to rely on Case 437, which was a joint application. It was pointed out that the basis of this application was our Disclosure 4–2, but that this disclosure did not support the invention. The invention covered by Case 437 evolved out of a laboratory conference held subsequent to the filing of disclosure 4–2 which I thought had been attended by Dr. Bond, but not by Mr. Russell. It was decided that if Russell had not been present at that conference, invention was a sole invention and that Case 437 should therefore be converted to a sole application with a disclaimer by Russell."

Dr. Bond in a deposition taken December 17, 1952, on cross-examination by Mr. Lang, testified (Record, page 678):

"Q. Now, Dr. Bond, in the original application that was filed, the joint application, what is your recollection of the reason that it was filed as a joint application? A. The idea of utilizing a caustic solution containing an air-oxidation catalyst, along with a low-boiling mercaptan, for protection of the oxidation catalyst, and with the idea of using such a solution in the treating of naphthas that contained a preponderance of high-boiling mercaptans.

"This idea was conceived jointly by Mr. Russell and myself at about that time, so we therefore considered that we were the joint inventors in such a claim." And at page 682:

"Q. And it was as a result of this meeting which we had, this laboratory conference which this report says was had on May 28, 1946, that we finally decided to make it a sole application and to make you the sole inventor? A. That's right, yes. * * *

"Q. And what was the reason we reached that decision? A. We reached that decision because we believed at that time that I had first reduced it to practice, the claim in the Interference, and since I had done that without the collaboration of Mr. Russell, that he could not be considered one of the inventors. * * *

"Q. Now, why did we decide to change the application to a sole application? A. Well, as I understand it, the invention belongs to the one who first con-

ceives and puts into practice the invention, and since Mr. Russell had not put into practice the claim and I had, I was therefore the first inventor."

\* \* \* \* \*

Mr. Lang: I don't know why he is using this reduction to practice here. I think that Dr. Bond wasn't familiar enough with patent law.

\* \* \* \* \*

Mr. Lang: Your Honor, you must remember at the time this disclaimer was filed, the count that was involved in the interference was not the present claim on appeal here. It was an entirely different count. That is something I think you must keep in mind. And what Bond was talking about was the fact that he had reduced the invention of the count that was then in the interference, to practice, and he was thinking about work he had done in 1941, which is, you will find, Your Honor, the date we alleged in our first, when we had to file that new preliminary statement of Bond's, we alleged his work in 1941, because the count was a very broad count at that time, and we felt that the work he had done in 1941 would support that count.

(It should be noted that the present interference count was prepared in September, 1948, and the decision of the Patent Office Board of Interference Examiners was rendered March 28, 1951, while the second disclaimer secured from Russell is dated January 20, 1953.)

18. See Note 17. In the same deposition, Dr. Bond testified further:

"Q. Will you relate the genesis of this application, how it got started on its way? A. The original work involved some attempts to use a particular caustic treating solution which was prepared to test the efficiency of certain treating solutions, caustic treating solutions containing an oxidation catalyst, with some excess mercaptans.

"A solution was prepared that contained a butyl mercaptan. Someone in the laboratory had made some very preliminary tests and found that it was not possible to produce a sweet naphtha by treating it with such a solution. *Mr. Russell and I,* upon discussing this experience, in the light of what *we* knew about the distribution coefficient of the various mercaptans between caustic and naphtha solutions, immediately saw the reason why it had not been possible to

ney, Lang, who was present at the January 26 conference when Bond's invention is claimed to have been "evolved", states in a memorandum that the improvement of the interference count is a deduction which would be obvious to one skilled in the art from a reading of Disclosure 4–2, together with the report of the January 26 conference.[19] This memorandum further states that the interference count is based on the invention in Disclosure 4–2 and that Disclosure 4–4 deals with an entirely different concept. On the basis of Bond's own testimony, confirmed by the statements of Lang, the court finds that Russell was Bond's co-inventor, which fact is not changed by Russell's disclaimers; and that Bond and Russell probably conceived their invention on or about January 17, 1944, at which time a partial disclosure was made in Disclosure 4–2.

Although the evidence before this court may show a lack of diligence on the part of Cauley and Socony from Cauley's conception until Shell's letter of October 30, 1943,[20] prodded Socony into investigating just what Cauley had done,[21] since Socony's conception and constructive reduction to practice both antedated those of Shell, it is unnecessary to consider Shell's application further.

As between Socony and Pure Oil, the court finds there was no lack of diligence on the part of Socony after Socony became aware in November, 1943, that Cauley had conceived the invention here involved. It was testified by Socony's New York patent attorney, Burkhard, that he discussed the matter promptly with Cauley[22] and that it was determined that an inquiry should be made at the East St. Louis refinery to make sure Cauley was the sole inventor. The re-

remove mercaptans by using this solution.

Since at that time *we* were interested in this question of treating the gasoline with caustic solutions, it appeared to *us* that it should be possible to develop a useful process and to utilize a caustic solution containing an air-oxidation catalyst in the treating of naphthas that contain a preponderance of heavy mercaptans, *if we would add or make some provision for having present in the treating solution a certain amount of low-boiling mercaptans to protect the catalyst.*

"Q. What did you do after you did this laboratory work? What was your next step? A. *We* did certain tests in which we contacted a caustic solution containing mercaptans with a naphtha gasoline and analyzed the gasoline after the contacting and formed more mercaptans.

"Q. That was your laboratory work? A. That was the laboratory work.

"Q. What happened after you completed those tests? A. *We* prepared Disclosure 4–2.

"Q. That is the disclosure, is it not, which has been put in evidence as Bond Exhibit No. 1 in Interference No. 82,077? A. Yes."

19. Lang in his "Reply to 'Reply Brief Relative to "Patentability" for Shell Development Co.,'" states: "No reasonable person skilled in the petroleum refining art could read Disclosure 4–2 (Pure Oil

Exhibit No. 2) together with the January 26, 1944 report (Pure Oil Exhibit No. 4) without understanding that the subject matter of Disclosure 4–2 was to be used in connection with the extraction of mercaptans, by means of alkali solution, from high boiling naphtha which did not contain ethyl mercaptan. Since the stated purpose of Disclosure 4–2 is to regenerate the alkali solution in the presence of relatively high concentrations of methyl of ethyl mercaptans in order to protect the catalyst, it is obvious that if one were to treat naphtha which did not contain ethyl mercaptans, one would have to add the ethyl mercaptans to the alkali solution." Lang states further in the same memorandum: "The disclosure (Disclosure 4–4) was directed to an entirely different concept from that in Disclosure 4–2. The concept in Disclosure 4–4 is directed to the determination that there is an optimum amount of total mercaptans which should be present in the alkali solution to get the maximum oxidation rate, using U.O.P. inhibitor No. 1 as an oxidation catalyst. The disclosure is not germane to the interference and Lang so testified on Page 81 of his deposition before the Patent Office."

20. Socony Exhibits No. 6 and 7.

21. Socony Exhibit No. 9.

22. This is corroborated by Socony Exhibits No. 8 and 10.

port of March 15, 1943, and drawing of "Proposal C," which constitute the tangible evidence of Cauley's conception, were prepared during his trip to East St. Louis, where he was in contact with men likewise skilled in the art, who might well have collaborated with him in originating "Proposal C." Good faith required an investigation as to who, in fact, originally conceived the idea.[23] In this court's view, Socony's delay demonstrated good faith rather than lack of diligence.

It is true, as Pure Oil points out, that Cauley was working at the Socony laboratories in Brooklyn, New York, during the period including October, 1943, to April, 1944, and was available to Burkhard. However, confirmation of the fact that Cauley was the sole inventor could be obtained only from those at the East St. Louis plant at the time of the conception. Common sense indicated the practicality of an investigation on the scene rather than attempting to make such a determination on the basis of correspondence or telephone conversations, and such an investigation was made at the earliest practicable date in the light of existing conditions.

In 1943 and 1944 the United States was engaged in a great war, and the members of the petroleum industry were concentrating their efforts on providing the sinews of war, particularly aviation gasoline. The different plants of Socony were spread across the continent. While the need for visiting these plants existed in wartime as well as in peace, the government demanded that travel be curtailed to a minimum, and Socony made every effort to comply. It was therefore determined, early in November, 1943, that Burkhard should make the investigation as to Cauley's inventorship when he went to the East St. Louis plant in February, while on a tour of the various refineries following a "manufacturing group meeting" which had already been scheduled to begin on February 14, 1944, in Kansas City. Socony's delay in preparation of the Cauley patent application from November, 1943, to the end of February, 1944, was therefore not due to any lack of diligence, but was directly attributable to the wartime restriction on travel, a circumstance over which neither Cauley nor Socony had any control. This is not a case where the applicant is heard to claim his lack of diligence should be excused merely because of the existence of a war which in no way affected his activities.

"There is no hard and fast rule by which to determine the question of diligence. Each case must depend upon its own circumstances."[24] "The diligence required is not extraordinary. It needs to be only reasonable under the circumstances of the case; nor does it 'involve uninterrupted effort nor the concentration' of all the applicant's energies upon the single enterprise."[25] The patent application was prepared by Burkhard for Cauley within a reasonable time after his return from East St. Louis to New York. Under the extraordinary circumstances prevailing during the crucial period in this case (shortly before January 26, 1944, to April 6, 1944), the court finds Cauley and Socony were not guilty of any lack of diligence.

For the foregoing reasons the court finds that, if the interference count be held patentable, Socony is entitled to the patent on the basis of Cauley's priority of conception.

While counsel were unanimous in the view that patentability is not an issue in this case, the court raised the issue during the course of the trial. It has been held

23. "* * * it has been held repeatedly that a valid patent can only be granted to the real inventor, that the original and first inventor must make the application, and that, in the case of a patent which is a joint invention, a patent issued to one only of the inventors is void. See, Smart v. Wright, 8 Cir., 1915, 227 F. 84; Tin Decorating Co. of Baltimore v. Metal Package Corp., 2 Cir., 1930, 37 F. 2d 5, 7; City of Milwaukee v. Activated Sludge, Inc., 7 Cir., 1934, 69 F.2d 577, 587." Pointer v. Six Wheel Corporation, 177 F.2d 153, 157, certiorari denied 339 U.S. 911, 70 S.Ct. 570, 94 L.Ed. 1338.

24. Walser v. Scott, 52 App.D.C. 232, 285 F. 966; Griffin v. Swenson, 15 App.D.C. 135.

25. Dickinson v. Swinehart, 49 App.D.C. 222, 263 F. 474.

that in actions under R.S. § 4915 growing out of interference proceedings in the Patent Office wherein a patent has issued to one of several applicants, the question of patentability, when raised by any of the parties, is an issue which must be considered and determined by the court.[26] Even though the parties to an action under § 4915 are willing to ignore the question of patentability and to litigate merely the question of priority, the court cannot overlook the question of patentability, since no adjudication can be made in favor of any applicant unless his alleged invention is a patentable one.[27] Inasmuch as the court finds that Socony is entitled to priority rather than Pure Oil, the issue of patentability must be determined in this case.

There were introduced in evidence certain publications over the period from 1935 to 1940 [28] which show that a great deal of progress had been made at that time in processes for mercaptan extraction, and particularly the knowledge of the re-entry values of mercaptans. The Happel and Cauley paper, T.A.C. Report GPG–1,[29] the data for which was completed in February, 1943, deals with a process for treating gasoline containing mercaptans with an aqueous alkali metal hydroxide reagent containing an effective amount of soluble organic oxidation promoter, itself capable of oxidation, for the purpose of removing the mercaptans, and regeneration of the fouled reagent by air-blowing. It further discloses that a certain amount of mercaptans must be retained in the reagent during regeneration in order to prevent loss of the organic oxidation promoter,[30] and that heavy mercaptans generally oxidize more readily than

light mercaptans. Tables I, II, and III deal with the regeneration rates of various mercaptans in different treating solutions, and Table V gives the minimum mercaptan sulfur concentrations required for protection of the regeneration catalyst. As stated earlier, the report was released as a restricted document to the oil industry by the Petroleum Industry War Council at a time when every effort was being made to speed up production of gasoline.

Patents have been obtained by Happel and Cauley on a number of the disclosures included in GPG–1,[31] but none of these include the information that the heavier mercaptans generally oxidize more readily than the light mercaptans in regeneration of fouled treating solutions. Doctor Happel testified that he had never seen any source of information other than Cauley's tables in GPG–1 on the relative rates of regeneration of light and heavy mercaptans; that he might have seen some papers based on this data, but he had not seen any other original data. There was no evidence presented that there was prior original data on the subject.

The only two expert witnesses whose testimony on the issue of patentability is included in the record before this court are Doctor Happel and Dr. Vladimir A. Kalichevsky. Doctor Happel, in response to specific questions put by the court, testified that one skilled in the art, with the information contained in GPG–1 could arrive at the invention set forth in the interference count. Dr. Kalichevsky stated in his deposition that GPG–1 contains data from which the count may be deduced, and explained how it might be deduced from such data.[32]

26. Knutson v. Gallsworthy, 82 U.S.App. D.C. 304, 164 F.2d 497.

27. Hill v. Wooster, 132 U.S. 693, 698, 10 S.Ct. 228, 33 L.Ed. 502.

28. Pure Oil Exhibits No. 17 to 21, inclusive.

29. Shell Exhibit No. 23.

30. T.A.C. Report GPG–1 states: "Those catalysts which have been found most effective for the regeneration of solutions containing mercaptans are: tannic acid or tannins, phenolic acids and polyhydroxy-benzenes * * *. The

above catalysts are themselves readily oxidized in alkaline solutions but this oxidation is effectively inhibited by the presence of mercaptans."

31. See Footnote 10, supra.

32. "Q. Do you find in that paper the process defined by this count that you read a while ago, the Count of Interference, No. 82077? A. No.

"Q. Do you find in that paper data from which the process defined in that count may be deduced? A. Yes.

"Q. Will you please, using the paper, explain to me how the process may be

The evidence showed that Bond, Pure Oil's inventor, had seen GPG–1 and discussed it with Russell at about January 17, 1944, the date Bond and Russell made the first partial disclosure of the invention embodied in their Disclosure 4–2. Shell's inventor, Zublin, died in the Spring of 1945, prior to the interference proceedings in the Patent Office. Shell's witness Gratama, manager of its patent department, in his deposition testified that Socony had sent to Shell several applications prepared by Socony on the solutizer tannate process; that he did not remember whether he had received GPG–1 before October 25, 1943, Zublin's conception date; and that he did not know whether Shell had done any work on the respective rates of oxidation of different mercaptans or the source of the figures mentioned in Zublin's application. However, Zublin's Tables I and II, appearing at page 6 of his application, are a partial reproduction of Cauley's Tables I and V at pages 4 and 5 of GPG–1. Although Zublin did not include all the figures in Cauley's Tables I and V, the columns used by Zublin are, figure for figure, identical with Cauley's tables. It is inconceivable that this could have occurred if Zublin had not had GPG–1 at hand:

It is significant that the conception date claimed by Cauley in March, 1943, is shortly after he completed the work which resulted in GPG–1, and the conception dates claimed by Zublin and Bond are, respectively, shortly after release of GPG–1 and a few months thereafter, at which time the information in GPG–1 was available to the petroleum industry. This raises an inference that the invention was a natural deduction from that information. The fact is that three persons skilled in the art— Cauley, Zublin, and Bond—knowing that a minimum amount of mercaptan sulfur must be retained to protect the organic catalyst from oxidation and that the lower re-entry value of light mercaptans made their retention in the regenerated treating solution preferable to retention of heavy mercaptans, within a relatively short time after the information in GPG–1 as to the varying oxidation rates of mercaptans was available to them, reached the conclusion that it would be a useful improvement to add light mercaptans in regenerating a fouled treating solution containing predominantly heavy mercaptans. This conclusion was not the result of long toil and experimenta-

deduced from data in that paper? * * * A. Suppose we go to drawing No. 9. This drawing shows distribution coefficients of mercaptans.

"Q. Distribution coefficient and partition coefficient, are they different or the same thing? A. Very similar. In fact, I used the word 'coefficient' in defining distribution.

"Q. I didn't remember. A. So it shows distribution coefficients of mercaptans for mercaptans of various molecular weights in the presence of tannic acid and it shows that the partition coefficients is small for the high molecular mercaptans. This shows that it is harder to extract the high molecular weight ones. Now we go from this to page 5, on page 5 we have Table IV (sic). This table shows that a certain minimum concentration of mercaptan sulfur is required in order to protect tannin which acts as regeneration catalyst. This simply shows that if you do not want to lose your tannin you must have a certain amount of mercaptan sulfur present. Now, from this one we go to page 4, Table III. This table shows that the lower mercaptans are regener-

ated not as fast as the heavier mercaptans. Now we go back to the so-called re-entry value, which means that in order to protect tannin we must have some mercaptans present. If we have the high molecular weight mercaptans present the solution is not going to be very satisfactory for the extraction of the heavy molecular weight mercaptans because of the high re-entry value, while this re-entry value is much less important for the low molecular weight mercaptans.

"Q. You are only partly through or are you through? A. I believe that answers completely that. In other words, what I want to say is that anybody would understand from that the importance of light mercaptans in the regeneration process and that is, as I have said here, very plain.

"Q. Does it make any difference at this point in the regeneration where the light mercaptans come from or how they get into the solution being regenerated? A. No." (Record, beginning at page 660.)

tion,[33] but rather a natural advance in the art.

 A logical step forward to be considered by anyone experimenting in the field, which accomplishes no new and unexpected result, although of economic importance, is not a patentable improvement.[34] For anticipation, it is not necessary to show that the inventor had actual knowledge of the prior art.[35] There is no invention where prior scientific publications reveal knowledge sufficient to teach men skilled in the field or to suggest to them what is claimed to be invention.[36]

 As to Zublin and Bond, therefore, the invention would not have been patentable, since prior inventions and scientific publications disclosed sufficient knowledge to suggest the invention to men reasonably skilled in the art.

 As to Cauley, a different question is presented, since the contribution in the field of mercaptan extraction which, added to other known principles, suggested the invention of the interference count, namely, the varying oxidation rates of the different mercaptans, was the work of Cauley. The question therefore arises whether the interference count is sufficiently distinct from prior patents issued to Happel and Cauley not to result in duplication and to warrant issuance of a separate patent.[37] Since it was the view of the Patent Office that the subject of the interference count is patentable, the Patent Office must have determined that the disclosure is not included in any prior patent issued to Happel and Cauley. The strong presumption of the correctness of the decision of the Patent Office as to patentability must be overcome by evidence that it is clearly erroneous.[38] There is no such evidence in the instant case.

For the foregoing reasons, the court holds that the interference count is patentable as to Cauley, and therefore in Civil Action No. 2776–51 Socony is entitled to a judgment for issuance of a patent. The complaint in Civil Action No. 2434–51 will be dismissed.

Counsel will present promptly appropriate findings of fact, conclusions of law, and order in each case.

33. On the contrary, at the trial it was the position of Pure Oil that the Bond invention "evolved out of a laboratory conference on January 26, 1944," held nine days after the partial disclosure by Bond and Russell on January 17, 1944. Bond himself testified in his deposition of December 17, 1952, that he and Russell, in the light of their knowledge about the distribution coefficients of the various mercaptans, "immediately" saw the reason why it had not been possible to remove mercaptans by use of a treating solution containing butyl mercaptans, whereupon it appeared to them that it would be advisable to add to the treating solution a certain amount of light mercaptans.

34. Universal Oil Products Co. v. Globe Oil & Refining Co., 322 U.S. 471, 64 S.Ct. 1110, 88 L.Ed. 1399; Vanadium Corp. of America v. Marzall, 91 U.S.App.D.C. ——, 197 F.2d 187; Minnesota Mining & Mfg. Co. v. Coe, 69 App.D.C. 217, 99 F.2d 986.

35. Millett v. Allen, 27 App.D.C. 70.

36. Radtke Patents Corp. v. Coe, 74 App. D.C. 251, 122 F.2d 937, certiorari denied American Tri Ergon Corp. v. Radtke Patents Corp., 314 U.S. 695, 62 S.Ct. 410, 86 L.Ed. 556.

37. Smith v. Kingsland, 85 U.S.App.D.C. 284, 178 F.2d 26.

38. Montgomery v. Marzall, 88 U.S.App. D.C. 281, 189 F.2d 640; Smith v. Kingsland, supra.